IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| TIA MOORE WILSON, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:25-cv-01054-AJT-IDD |
| PETER B. HEGSETH, | ) ) ) | |
| *Defendant.* | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff worked as an assistant at the Defense Human Resources Agency ("DHRA" or "Defendant")[1] until her termination in February 2022 for purported performance issues. In this employment action, Plaintiff alleges age, race, disability, and veteran status discrimination and retaliation for protected activity in connection with her February 2022 termination. Defendant Peter Hegseth's Motion to Dismiss for Lack of Jurisdiction and for Summary Judgment ([Doc. Nos. 44, 45], the "Motion").[2] The Court held a hearing on the Motion on March 25, 2026, following which it took the Motion under advisement.[3] Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, the argument of counsel at the hearing and for the reasons below, the Motion is **GRANTED**.

---

[1] Although Secretary of War Peter Hegseth is the only named defendant, the Court will use the term "Defendant" to refer to Plaintiff's employer broadly.

[2] The Motion was mistakenly filed in duplicate as Docket Numbers 44 and 45.

[3] The record for the purposes of the Motion is primarily the extensive record from Plaintiff's hearing before the Equal Opportunity Employment Commission ("EEOC"). Plaintiff has presented no evidence outside of that EEOC record and the Court will refer to any part of that record by the docket number used by Defendant.

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

A. Plaintiff's Hiring and Accommodations

Plaintiff is a 58-year old black woman and former U.S. marine; she is diagnosed with multiple sclerosis and optic neuritis causing blindness in her right eye. [Doc. No. 47-6] at 2, 7. Plaintiff began working at DHRA as a GS-11 Executive Assistant on July 6, 2021, providing administrative support functions for senior leadership within the Defense Enterprise Operations Center.[4] *Id*. at 5; [Mot.] at 3; [Opp.] at 3. Her direct supervisor was Stephen Daniels, who participated in her hiring; she was also occasionally assigned work by Senior Business Analyst Molly Dunham, although Dunham was not technically in her managerial chain of command. [Doc. No. 47-6] at 5–6; [Mot.] at 3; [Opp.] at 4.

On July 9, 2021, shortly after her hiring, Plaintiff requested an extensive list of accommodations for her disabilities, including "a flexible work schedule, an air purifier, anti-fatigue matting, accessible parking, attendance accommodation, worksite redesign, ergonomic office equipment, a fan, an enlarged screen, telework during inclement weather, and auditory versions of printed documents." [Opp.] at 3, 5; [Mot.] at 4; [Doc. No. 46-1] at 13–17; [Doc. No. 47-1] at 44. The parties disagree substantially on whether and when these requests (chiefly Plaintiff's handicapped parking and telework requests) were approved and/or implemented, as discussed further below.

---

[4] The parties dispute whether Plaintiff was a probationary employee, a status that appears from the parties' briefs to depend on whether DHRA properly credited her prior service in the Marine Corps (and which classification gives rise, in part, to her claim for veteran status discrimination). ([Mot.] at 3; [Opp.] at 4). The issue of her probationary status appears to be related solely to Plaintiff's claim for veteran status discrimination under USERRA. *See* [Am. Compl.] ¶ 159 ("Plaintiff, a military veteran, was denied a benefit of her employment when the Defendant failed to properly credit her military service toward her retirement, in violation of USERRA."). The Plaintiff characterizes this classification issue as a material issue of disputed fact rather than a legal determination. In any event, because the Court lacks jurisdiction over Plaintiff's USERRA claim as discussed herein, the Court need not determine whether she was properly classed as a probationary employee.

2

B. Performance, Interactions with Supervisors, and Termination

Plaintiff's tenure at DHRA involved issues pertaining to both the technical and interpersonal aspects of the job. In that regard, the parties exchanged communication regarding what Defendant considered were missed deadlines her need for extensive supervision, training, and "re-work." *See, e.g.* [Doc. No. 46-1] at 60–62, 66, 69–71, 97, 101–07, 131 (evidencing numerous emails which reflect these issues). In December 2021, DHRA conducted a mid-year performance review, the written report from which shows that Plaintiff had completed only three out of fourteen listed tasks ([Doc. No. 46-1] at 126–28), and Daniels testified before the EEOC that at that time he viewed her performance as unsatisfactory on two out of five review "elements." [Doc. No. 47-3] at 534. However, Plaintiff was not formally disciplined nor placed on a Performance Improvement Plan or similar type of intervention prior to her termination. *See* [Reply] at 10.

As tension with her supervisors mounted, Plaintiff in December 2021 and January 2022 met with DHRA Chief of Staff Frank Jones, during which she formally complained about her treatment by Daniels and Dunham. [Mot.] at 22; *see also* [Doc. No. 46-1] at 3. Jones offered to help and asked if Plaintiff would be interested in transferring to another role, but ultimately nothing came of that. *Id*. Plaintiff was given a written termination latter on February 1, 2022, and the stated reason for termination was deficient performance. [Mot.] at 8; [Opp.] at 7–8; [Doc. No. 46-2] at 17–18.

Following her termination, Plaintiff timely filed a formal EEOC complaint against the Department of Defense, alleging similar discrimination and retaliation claims to those alleged here. [Doc. No. 46-2] at 22–27. The EEOC held a five-day hearing before an EEOC Administrative Law Judge ("ALJ") with testimony from eleven witnesses, and the ALJ

ultimately issued a written decision finding against Plaintiff on all claims of discrimination and retaliation. [Doc. No. 47-6] ("EEOC Decision"). On June 23, 2025, Plaintiff filed this action and an Amended Complaint on January 26, 2026. [Doc. Nos. 1, 27].

The Amended Complaint asserts the following claims:

(1) three claims under Title VII of the Civil Rights Act of 1963 ("Title VII"): for Race Discrimination (Count I), Retaliation (Count II), Hostile Work Environment (Count III);

(2) three claims under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*: two claims for Disability Discrimination (Counts IV, V) and one claim for Retaliation (Count VI);

(3) a claim for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (Count VII); and

(4) a claim for veteran status discrimination under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 (Count VIII).

Cutting through all these claims are Plaintiff's core complaints that during her seven-month employment, (1) she was not timely given a handicapped parking pass, permission for telework or a "maxi-flex schedule;" (2) she was not timely provided access to essential computer systems; (3) her work was subjected to heightened scrutiny; (4) her supervisor made a derogatory remarks about her right-eye blindness and on one occasion verbally credited her work to a colleague at a workplace town hall; and (5) she was improperly classed as probationary due to Defendant's failure to credit her past military service. *See generally*, [Am. Compl.].

## II. LEGAL STANDARD

### A. Motion to Dismiss for Lack of Jurisdiction

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction and requires the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *White v. CMA Const. Co., Inc.,* 947 F. Supp. 231, 233 (E.D. Va. 1996) (*citing McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

A Rule 12(b)(1) motion may challenge subject matter jurisdiction by way of either a facial challenge or a factual challenge. A facial challenge asserts that the complaint on its face "fails to allege facts upon which subject matter jurisdiction can be based." *White*, 947 F. Supp. at 233 (*quoting Adams*, 697 F.2d at 1219). Under such a facial challenge, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id*. Alternatively, a defendant may assert a factual challenge, contending that the jurisdictional allegations of the complaint are not true. *Adams*, 697 F.2d at 1219. A factual challenge puts the district court's "very power to hear the case" at issue; and the district court is then free to weigh the evidence to determine the existence of jurisdiction. *Id*. When such a challenge is made, the jurisdictional facts must be determined with the same procedural safeguards as afforded through a motion for summary judgment. *See Kerns v. United States*, 585 F.3d 187, 192–93 (4th Cir. 2009).

### B. Motion for Summary Judgment

The standard for granting summary judgment is satisfied if, after a review of the record, the Court finds that there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

5

250 (1986). There are no material facts in dispute "unless there is sufficient evidence favoring the nonmoving party." *Anderson*, 477 U.S. at 249. Sufficiency of the nonmoving party's evidence is evaluated by whether a reasonable juror could find in their favor by a preponderance of the evidence; thus, "the mere existence of a scintilla of evidence in support of the [party's] position will be insufficient." *Id*. at 252. And while the Court must resolve conflicting inferences from circumstantial evidence in favor of the nonmoving party, the review standard does not allow for the "distort[ion] of the plain meaning of words or [to] conveniently to read them out of context." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 821–22 (4th Cir. 1995).

Federal employees alleging violations of Title VII and the Rehabilitation Act are entitled to a trial *de novo* in federal district court following the administrative process. *Chandler v. Roudebush*, 425 U.S. 840, 845–46 (1976). In such proceedings, the district court considers the claims anew and is not bound by the findings or conclusions reached during the administrative process. *Id.* Although the court conducts a de novo review, the administrative record, including testimony and evidence presented during EEOC proceedings, may be admitted as evidence and considered by the court. *Laber v. Harvey*, 438 F.3d 404, 420–21 (4th Cir. 2006) (en banc). Evidence from the administrative process, including sworn testimony from an EEOC hearing, may therefore be used in evaluating the merits of Plaintiff's claims.

### III. DISCUSSION

A. The Court Lacks Subject Matter Jurisdiction as to Counts IV and VIII

Defendant claims that Plaintiff' disability discrimination claim under the ADA (Count IV)[5] is barred by sovereign immunity as the sole Defendant is the head of a federal executive agency sued in his official capacity and thus is entitled to assert the sovereign immunity defense.

---

[5] Although Plaintiff brings Count IV under both the ADA and the Rehabilitation Act, Defendant contends that the Court lacks jurisdiction only as to the ADA component of that claim.

6

The Court agrees. A suit against a head of a federal agency in their official capacity is equivalent to a suit against the United States and is barred unless sovereign immunity has been waived, *Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000), and the federal government has not waived sovereign immunity for ADA claims. *Marynowski v. Brady*, 2024 WL 4138746, at *3 (E.D. Va. Sept. 10, 2024), *aff'd sub nom. Marynowski v. Schiavino-Narvaez*, 2025 WL 1720514 (4th Cir. June 20, 2025).[6]

Defendant next seeks dismissal of Plaintiff's Count VIII[7] under USERRA on both jurisdictional and exhaustion grounds. The Court again agrees. In that regard, a USERRA claim must first be brought before the Merit Systems Protection Board ("MSPB"), and then may be appealed only to the Federal Circuit. [Mot.] at 11 (citing 8 U.S.C. § 4324(a) (a terminated DOD employee "may request that the Secretary refer the complaint for litigation before the Merit Systems Protection Board")); *see also* 8 U.S.C. § 4324(d)(1) ("A person adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board under subsection (c) may petition the United States Court of Appeals for the Federal Circuit to review the final order or decision").

Notwithstanding USERRA's forum-prescribing statutory scheme, Plaintiff argues that in light of its remedial purpose of safeguarding employees' rights, the statute should be construed broadly to allow claims in federal court. [Opp.] at 18–21. In support of that contention, she points to the Department of Labor's implementing regulations, *see Id*. (citing 38 U.S.C. § 4323(b)(3)), but those regulations pertain to claims against private-sector employers, which are

---

[6] Plaintiff does not specifically dispute that sovereign immunity applies but contends that this Court has jurisdiction because "Plaintiff has satisfied all statutory prerequisites for filing suit in federal court. Specifically, she fully exhausted her administrative remedies, timely filed this action, and named the proper defendant." [Opp.] at 14–15. But whether sovereign immunity applies with respect to the ADA claim does not depend on whether Plaintiff has exhausted her administrative remedies.

[7] The Amended Complaint misnumbers this claim as Count IV. [Am. Compl.] at 35.

treated differently than federal government employers under the statute. *See Id.* ("In the case of an action against a private employer by a person, the district courts of the United States shall have jurisdiction over the action"). *See also Padilla-Ruiz v. Comm. Techs., Inc.*, 355 F. Supp. 441, 450 n.3 (E.D. Va. Jan. 9, 2019) ("the Merit Systems Protection Board, not the court, [has] exclusive jurisdiction over USERRA claims against the United States"). Plaintiff cites no support for her broader construction of the enforcement scheme under USERRA. For these reasons, the Court lacks subject matter jurisdiction over the USERRA claim,[8] and both Count VIII as well as the ADA component of Count IV must be dismissed.

B. There is insufficient evidence to support Plaintiff's claim for disability discrimination under the Rehabilitation Act (Counts IV and V)

In Counts IV and V, Plaintiff claims that DHRA violated the Rehabilitation Act by (1) failing to accommodate her disabilities, [Am. Compl.] ¶¶ 101, 115, and (2) discriminating against her based on her disabilities. *Id.* ¶¶ 102, 105, 115. Defendant contends that Plaintiff introduced insufficient evidence for either claim. The Court agrees.

i) *Failure to Accommodate*

"To establish a *prima facie* claim of failure to accommodate under the Rehabilitation Act, a plaintiff must demonstrate that (1) she was a qualified person with a disability; (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation." *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019). Plaintiff's claim that DHRA failed to accommodate her disability is based on her contentions that DHRA unreasonably delayed in granting her a handicap accessible parking pass ( [Opp.] at 26); that her

---

[8] Accordingly, the Court need not address whether DHRA correctly classed Plaintiff as a probationary employee (see [Mot.] at 3; [Opp.] at 4), since that issue pertains only to her USERRA claim.

request for telework and a "maxi-flex" schedule was denied (*Id*. at 5–6); and that she was "denied access to essential computer systems for over a month due to purported IT issues." *Id*. at 4–6.

As to parking, it is undisputed that Plaintiff requested handicapped parking on July 9, 2021, [Doc. No. 47-1] at 45, and received a permanent handicapped parking pass on August 25 2021, less than two months after her employment began. *See* [Opp.] at 5. Defendant also contends with supporting evidence that five days after Plaintiff began her employment, she was granted a temporary accessible parking pass that was good for two months, which was converted into a permanent pass in August 2021, before the expiration of her temporary pass. [Opp.] at 4 (*citing* [Doc. No. 46-1] at 26).

Plaintiff does not dispute that she received a permanent parking pass on August 25, 2021 or that she received a temporary parking pass; her own relied-upon testimony as far as when she received that temporary pass is vague and unclear, and the exhibits she cites to in support of her position do not concern or prove this asserted timing. [Opp.] at 26 (*citing inter alia* [Doc. No. 47-5] at 1083–86 (reflecting remarks by Plaintiff's counsel before the EEOC largely unrelated to parking). In her testimony before the EEOC, Plaintiff stated that her parking pass "wasn't approved until I got involved with the whole process because James Harris, he's over the facilities, he didn't know anything about getting temporary parking… so I did get the parking, but it was through my own efforts." [Doc. No. 47-3] at 429–30; *see also Id*. at 445 ("and then I helped him help me by getting -- using that directive and getting the paperwork to Strickland that I needed to move my parking closer."). It is unclear whether this refers to the permanent or the temporary pass, and if the latter, when exactly Plaintiff "got the parking…through her own efforts." She also has testified that she received a "parking pass," presumably referring to a

9

temporary parking pass, "after two weeks of having to painfully walk twenty minutes from a visitor center parking facility." [Doc. No. 46-1] at 26, 91; [Opp.] at 5 (*citing* [Doc. No. 47-3] at 436–37); [Doc. No. 47-1] at 11–15; [Doc. No. 47-6] at 4–5; [Doc. No. 47-5] at 71).[9]

There is substantial evidence in the record that Plaintiff's temporary parking pass was issued on July 14, 2021. [Doc. No. 46-2] at 91.[10] But even accepting Plaintiff's version of events, the evidence establishes as a matter of law that Defendant did not fail to accommodate her disability based on an unreasonable delay in giving her a parking pass, as "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support" a claim for failure to accommodate, particularly "where the record demonstrates the accommodation request is under active consideration." *Smith v. CSRA*, 12 F. 4th 396, 415 (4th Cir. 2021). Here, her request for a handicapped parking space was under "active consideration" from the time it was requested until the permanent request was fulfilled, and the evidence Plaintiff presents with respect to any delay in issuing a parking pass (whether the temporary or permanent passes) is insufficient as a matter of law to establish a violation of the Rehabilitation Act.

Regarding telework, the record is clear that between at least September through December of 2021, most DHRA employees including Plaintiff were working 100% remotely due to COVID-19. [Doc. No. 47-3] at 469. However, Plaintiff contends that "after she recovered from COVID-19 in August 2021, her supervisor, Mr. Daniels, ordered her to return to the office on a rigid schedule," [Opp.] at 6, even though her doctor recommended and she requested

---

[10] *See* Declaration by facilities staff employee James Harris ([Doc. No. 46-2] at 91); DHRA's correspondence with a parking contractor, which denied the parking pass request initially because not adequately supported by a doctor and DHRA's follow-up request for a temporary pass while Plaintiff awaited a new doctor's appointment ([Doc. No. 46-1] at 19–24); and a form labeled KCC0-CEHS, which appears to be the temporary pass itself and is signed by a medical doctor. [Doc. No. 46-1] at 26.

10

telework privileges (of at least two days per week) and a "maxi-flex" schedule.[11] In support of that claim, she cites to her own EEOC testimony, where she testified that sometime after she submitted her list of accommodation requests, Daniels rejected her request for two days of telework, *see* Doc. No. 46-1] at 39 [Doc. No. 47-3] at 439 (Daniels "explained to me that my position was not a position that was to telework. It was for me to be the face of–to–of the staff [sic]."), as well as to various pieces of correspondence, none of which supports her contention.[12] See [Doc. No. 46-1] at 99, 107, 109, 116, 121, 123, 615. She went on to state before the EEOC, however, that over the course of July and August 2021, she was initially granted one day per week of telework, which was then increased to two days after she emailed another supervisor, Katrina Logan. [Doc. No. 47-2] at 347); *see also* [Doc. No. 47-3] at 420–24. Defendant counters that both of Plaintiff's requests were granted, citing, *inter alia,* EEOC testimony in which Plaintiff conceded she was approved for two days of telework in or around July 2021. *See* [Doc. No. 47-2] at 347; [Doc. No. 46-1] at 34; [Doc. No. 47-2] at 347.

The undisputed record is that Plaintiff worked remotely from approximately September to December 2021 pursuant to the COVID-19 mandate (*see Id.* (EEOC transcript where Plaintiff admits full-time remote after COVID-19); *see also* [Doc. No. 47-3] at 469–70)), and even if Plaintiff's testimony that Daniels required her to return full-time in August is credited, only at most a few weeks would have passed before she worked full-time remotely in September 2021, a period of time insufficient to establish a failure to accommodate as a matter of law.[13]

---

[11] A maxi-flex schedule allows certain federal workers to vary their hours while meeting an 80-hour biweekly requirement; it therefore refers to hours worked, not the location of that work. *See* 5 U.S.C. § 6122(a).

[12] Plaintiff's filings are unclear as to the particular period during which she claims she was required to work in-person, but nowhere does she claim that she was denied remote telework after the September Covid mandate for telework.

[13] Regarding Plaintiff's contention that she was denied access to IT systems for over a month [Opp.] at 4, she again cites only to her own vague EEOC testimony whereas Defendant adduced correspondence from July 2021 showing Plaintiff procuring her requested devices ([Doc. No. 46-1] at 34–35). And, for the same reason as the alleged delays

11

For the above reasons, Defendant is entitled to judgment as a matter of law on her failure to accommodate claim.

ii) *Disability Discrimination*

To establish a *prima facie* case of discrimination under the Rehabilitation Act, Plaintiff "must show that (1) she is disabled; (2) she was otherwise qualified for the position, and (3) she suffered an adverse action solely on the basis of her disability." *Hannah P.,* 916 F.3d at 342. An adverse action must affect "the terms, conditions, or benefits of the plaintiff's employment." *Credle v. Va. Comm. Coll. Sys.*, 2025 WL 27827, at *7 (E.D. Va. Jan. 3, 2025). Plaintiff references numerous purported "adverse actions" to support her discrimination claim, including that she was denied benefits, subjected to a heavy workload, denied leave to attend the Marine Corps birthday event, given insufficient credit for a project, was mocked by Daniels for her vision impairment,[14] and was ultimately terminated, all based on her disability. [Am. Compl.] ¶¶ 102, 115.

The only adverse employment action in the record is her termination,[15] as to which Plaintiff has not tendered evidence sufficient as a matter of law to establish the requisite causality between her disability and her termination. Unlike Title VII, the Rehabilitation Act requires Plaintiff to show that her disability was the *only* reason for her termination; her performance cannot have played any part. *See Hannah P.*, 916 F.3d at 342; *see also Buko v. Am.*

---

in fulfilling her parking and telework requests, even if Plaintiff had proven the alleged delay, it would not rise to the level of a failure to accommodate under the Rehabilitation Act.

[14] Specifically, Plaintiff testified that on or about September 30, 2021, Mr. Daniels allegedly questioned "how much extra time a person with vision in one eye needs" to complete a task. [Opp.] at 6; [Doc. No. 47-2] at 332–38. Daniels stated in his declaration that he has no recollection making this statement. [Doc. No. 46-2] at 29. The substance of the comment is merely an inquiry (albeit blunt and perhaps mocking)) into how much of a time accommodation Plaintiff required.

[15] *See, e.g. Bell v. Shulkin*, 709 F. App'x 167, 170 (4th Cir. 2017) ("Rude comments about a plaintiff's inability to perform certain tasks because of a disability . . . are the type of simple teasing, offhand comments, and isolated incidents (unless extremely serious) that do not amount to discriminatory changes in the terms and conditions of employment.") (cleaned up).

*Med. Lab'ys, Inc.*, 830 F. Supp. 899, 905 (E.D. Va. 1993), *aff'd,* 28 F.3d 1208 (4th Cir. 1994) ("a required element of a claim for violation of the Rehabilitation Act is a showing that an employee's handicap is the sole reason for the employer's action.") (*citing Assa'Ad–Faltas v. Commonwealth of Virginia*, 738 F.Supp. 982, 987 (E.D.Va.1989)). Here, the record fully supports that from the perspective of her employer,[16] Plaintiff's termination was based on performance-related reasons, including an unchallenged declaration from Daniels that she began missing deadlines weeks into her employment and required extensions for eight out of fourteen projects before December 2021, one of which assignments was simply to schedule introductory meetings with the officials she supported, as well as contentious responses to inquiries about her work. *See* [Doc. No. 46-2] at 48 (EEOC testimony indicating that Plaintiff received a negative mid-year review in December 2021); [Doc. No. 47-3] at 489 (EEOC testimony indicating that the agency's HR department approved Plaintiff's termination specifically on performance grounds); *Id.* at 480, 485, 534, 536–37, 539; [Doc. No. 46-1 at 105–06 (when asked to confirm whether she followed certain instructions on a data entry task, Plaintiff replied "There are so many messages about the same stuff. I am requesting to see Mr. Register. I will let Jessica know, this is out of control. I am closing my notes out for the day."); [Doc. No. 46-1] at 97 (In a December 2021 email chain, when tasked with compiling a list of "DEOC government employees that were not able to attend the all-hands last week," Plaintiff said that "During our last meeting you ask [sic] Molly to take attendance…[T]his task has been hard since I was not originally given this task.").

---

[16] *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff") (*quoting Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960–61 (4th Cir.1996).

Based on the record, there are no genuine issues of material fact pertaining to her deficient performance from the perspective of her employer. Nor is there sufficient evidence to establish that these performance issues were a pretext for discrimination or were after-the-fact contrived justifications, as Plaintiff contends. *See, e.g.* [Opp.] at 2 ("Defendant's central premise—that Plaintiff was a struggling probationary employee terminated for poor performance—is a fiction."). For all these reasons, Defendant is entitled to judgment as a matter of law on her disability discrimination claim (Count IV).

C. There is insufficient evidence for plaintiff's other discrimination claims (Counts I, VII)

Plaintiff also brings Title VII claims for discrimination based on both her race and her age. In that regard, she claims that she was subjected to discrimination when she was denied credit for her "birthday wishes" project, subjected to an excessive workload, denied telework, denied training, and terminated. [Am. Compl.] ¶¶ 41, 45.

To prevail on her Title VII claim for discrimination, Plaintiff must prove discrimination either through direct evidence or through the pretext framework from *McDonnell Douglas,* 411 U.S. at 902–05. "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory [or retaliatory] attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.,* 703 F.3d 713, 717 (4th Cir. 2013). Plaintiff has failed to adduce any direct evidence of discrimination, as none of the conduct or statements she attributes to any of her supervisors directly reflects such an animus or bears on her termination.[17] Plaintiff must therefore prove discrimination through the *McDonnell Douglas*

---

[17] The closest Plaintiff comes to direct evidence on this point is her allegation in the Amended Complaint that Daniels accused her of "playing the race card" after she filed a complaint with HR, which she argued is evidence of racial animus. [Am. Compl.] at 14. However, in her Opposition to the Motion she does not refer to or proffer any evidence in support of this allegation and her testimony before the EEOC contains no express reference to this remark. [Mot.] at 20. And even if proven, this supposed comment is "the type of isolated statement that does not

14

rubric. Under that rubric, Plaintiff must establish a prima facie case by establishing that "(1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021). Once a prima facie case has been established, the burden then shifts to the Defendant to articulate a non-discriminatory reason for the adverse employment action, in response to which the Plaintiff must present evidence that the reason given was not the real reason but rather a pretext for discrimination. *Id*. at 650.

First, Plaintiff has failed to establish a *McDonnell-Douglas* prima facie case of race or age discrimination, as the record shows that she was not performing up to the legitimate expectations of her employer, and there is nothing in the circumstances of her termination that would raise a reasonable inference of discrimination. *See, e.g.* [Doc. No. 46-1] at 126–28) (Mid-year performance review showing Plaintiff completed only three out of fourteen listed tasks). But even if there were a prima facie case, the Defendant has articulated a non-discriminatory reason for her termination (namely, her poor performance as discussed above) and Plaintiff has not proffered sufficient evidence of pretext.[18]

---

amount to direct evidence of discrimination." *Matias v. Elon Univ.*, 780 F. App'x 28, 30 (4th Cir. 2019). Plaintiff does not allege any age-related statement by any of her colleagues.

[18] As evidence of pretext, Plaintiff points to what she regards as Defendant's "shifting explanations" for her termination, given the positive feedback she claims she received on her performance, including that she did a "really remarkable job" in her interview and that she had not been informed of her performance issues. *See* [Opp.] at 25 ("The sudden shift from a "remarkable" candidate to an "unacceptable" employee, which coincided precisely with her protected EEO activity, raises a strong inference of retaliatory motive."). The evidence tendered in support of that position is solely her testimony before the EEOC, which is refuted by her negative mid-year evaluation in December 2021. [Doc. No. 47-3] at 480, 485, 534, 536-37, 539. Plaintiff's reliance on statements regarding her pre-employment interview rather than her actual work performance further undermines any inference of pretext. Even the portions of the transcript Plaintiff cites regarding the absence of discipline make clear that her supervisors found her performance unsatisfactory throughout her employment. *See* [Doc. No. 47-1] at 174–75 (testimony by Logan that as of late 2021 "there was still not a comfort from Mr. Daniels that Ms. Moore could effectively take on the–the frequency and the responsibilities of what my schedule…what the job entailed."); *see also* [Doc. No. 47-3] at 460–

Plaintiff also fails to prove pretext for either her race or age claims by way of an adequate comparator. For that purpose, Plaintiff must show that another employee outside of her protected class or classes was "similarly-situated in all respects" and treated more favorably than she was, *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted), including that she and the proposed comparator "dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (cleaned up).

The only employee even vaguely asserted to be a comparator is Senior Business Analyst at DHRA Molly Dunham, and the only basis for her supposedly superior treatment was a single instance in which, at an employee town hall meeting, some work that Plaintiff allegedly performed on a "birthday greetings" project was allegedly credited to Ms. Dunham by their mutual supervisor Daniels. [Doc. No. 47-2] at 339–43.[19] Ms. Dunham is outside each of Plaintiff's protected classes: she is a white woman, is younger than Plaintiff, and does not appear in the record to be disabled. However, her role was at a very different level than Plaintiff's more clerical role,[20] ([Doc. No. 46-2] at 70), and there is no evidence that the quality of their performance in their respective jobs were similar or that the sole incident relied on to show

---

61 (Counsel: "When Ms. Moore came on board, was the skill set that she said she had during the interview, did that match up with the skill set she demonstrated after coming on board? Daniels: "It did not.").

[19] Plaintiff's reliance on Daniels' "birthday wishes" comment in connection with several of her claims appears to be based on a misapprehension on Plaintiff's part as to what Daniels was referring to. In that regard, there is considerable evidence in the record that Dunham had the idea to add the "birthday wishes" to the town hall presentation, which Daniels was referring to, rather that the sending of those "Birthday Wishes" by email, which Plaintiff had been tasked with. [Mot.] at 5-6; *see also* [Doc. No. 46-2] at 82. As addressed at the EEOC hearing, ([Doc. No. 47-2] at 340-44), Daniels' comment was in reference to this idea by Dunham, and Plaintiff merely conflated the two projects, although Plaintiff disputes this characterization. (*Id*.).

[20] In fact, during most of Plaintiff's tenure at DHRA, Dunham was serving in an even more senior position, Chief of Staff, pursuant to a temporary detail. *See* [Doc. No. 46-2] at 70.

disparate treatment, the "birthday wishes" incident, is insufficient to establish race or age discrimination through disparate treatment.

For all these reasons, Plaintiff's Title VII claims that the Defendant discriminated against her on account of her race or her age fail as a matter of law.

D. There is insufficient evidence that Plaintiff was terminated in retaliation for her protected activity (Counts II and VI)

In Counts II and VI, Plaintiff alleges that she was terminated in retaliation for her protected activity under Title VII and the Rehabilitation Act, respectively. To prevail on a retaliation claim, Plaintiff must show that (1) she engaged in protected activity under these statutes; (2) a materially adverse employment action was taken against her; and (3) there was a causal link between the protected activity and that action. *See Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). As with discriminatory animus, retaliatory animus may be proven either directly or pursuant to the *McDonnell-Douglas* framework. *See Laing*, 703 F.3d at 717. As for her other claims, the only adverse action Plaintiff can rely on is her termination.

Plaintiff claims that she was terminated in retaliation for her Title VII-protected activity in December 2021 and January 2022 when she complained to DHRA Chief of Staff Frank Jones about the management styles of Daniels and Dunham. [Am. Compl.] ¶¶ 24-25; [Opp.] at 7. Plaintiff points to the temporal proximity between these conversations and her firing, which falls within the two-month "rule of thumb" used in the Fourth Circuit to assess causation. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 218–19 (4th Cir. 2022); *see also Wood v. Bristol Va. Util. Auth.*, 661 F. Supp. 3d 538, 553 (W.D. Va. 2023). However, Plaintiff recorded both conversations in full, and the audio recordings, which are in the record ([Doc. No. 46-1] at 3), reflect that she never complained of race or age discrimination to Jones. The record, therefore, contains no evidence of cognizable protected activity by Plaintiff before her termination. There is

17

also uncontroverted evidence in the record that DHRA management initiated the process to terminate her (and had gotten at least some approvals to that end) before these conversations, which clearly refutes a causal link as required to support a retaliation claim. [Doc. No. 47-3] at 489. And in any event, as with Plaintiff's other claims, Defendant has, as discussed above, articulated a non-retaliatory reason for her termination and Plaintiff has not presented any evidence sufficient to establish pretext. Her Title VII retaliation claim therefore fails as a matter of law.

With regard to disability-related retaliation, Plaintiff claims that her termination was in retaliation for her protected requests for reasonable accommodations and her conversations with Chief of Staff Jones. Defendant concedes this is protected activity, but argues that she has not introduced evidence sufficient to show retaliatory animus, either directly or under the *McDonnell-Douglass* framework. [Mot.] at 27. The only arguable direct evidence in the record of retaliatory animus is Daniels' purported inquiry about how much time a person with vision in one eye needs to complete an assignment. ([Doc. No. 47-2] at 332–38), but this isolated comment cannot by itself prove retaliation. *See Bell*, 709 F. App'x at 170. Furthermore, one of Plaintiff's two protected activities (the request for accommodations) occurred well outside the two-month rule of thumb for temporal proximity with her termination (*see Laurent-Workman*, 54 F.4th at 218-19), and as discussed above, her conversations with Jones occurred after the termination process had been initiated, *see* [Doc. No. 47-3] at 489. Finally, given that the record contains extensive evidence in support of the proffered reason for her termination and Plaintiff has not produced sufficient evidence of pretext with respect to that proffered reason, Counts II and VI therefore fail as a matter of law.

D. There is insufficient evidence of a hostile work environment claim (Count III)

In support of her hostile work environment claim, Plaintiff contends that she was subjected to "heightened scrutiny," "constant battles over reasonable accommodations," and that "her contributions were publicly minimized or misattributed." [Opp.] at 27. To prevail, Plaintiff must show (1) unwelcome conduct; (2) based on her race or disability; (3) that is "sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment" and (4) imputable to DHRA. *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 407 (4th Cir. 2022).

The record fails as a matter of law to establish unwelcome conduct based on her race or disability that was "sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment." Clearly insufficient is the "birthday greetings" incident, even as related by the Plaintiff.  Similarly, her reliance on "constant battles over reasonable accommodation" is likewise insufficient given, as discussed above, that Plaintiff's reasonable accommodation requests were granted with delays or difficulties insufficient as a matter of law to establish a "severe or pervasive alteration of her conditions of employment that created an abusive work environment." Likewise, her relied-upon statements from Daniels, namely the "race card" comment alleged only in her Amended Complaint and his alleged question about "how much extra time a person with vision in one eye needs" to complete a task,[21] do establish a hostile work environment as a matter of law.

---

[21] As noted above, Daniels claims to have no recollection of this comment, and although Plaintiff claims Daniels made this statement in the presence of others, she produces no corroborating evidence and relies only on her own testimony.

Regarding Plaintiff's claims of "heightened scrutiny," while the record does reflect numerous instances when supervisors (including, but not limited to, Daniels) criticized her work, it also shows that the criticisms were with respect to identified issues of performance.[22]

Even when all the relied-upon incidents are considered in the aggregate, they fail to establish a hostile work environment as a matter of law and show, at most, "incidents that would objectively give rise to bruised or wounded feelings," "rude treatment by coworkers," or "callous behavior by one's superiors." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2006) (citation omitted). They are not, as a matter of law, "sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment," as required to sustain Plaintiff's claim, and Defendant is therefore entitled to summary judgment on Count III.

## IV. CONCLUSION

For the reasons stated above, the Court concludes that (1) Count IV is barred by sovereign immunity insofar as it alleges discrimination under the ADA; (2) the Court lacks jurisdiction over Plaintiff's USERRA claim (Count VIII) because by the terms of that statute such claims may be heard only by the MSPB or on appeal to the Federal Circuit; and (3) there are no genuine issues of material fact with respect to all of Plaintiff's remaining claims  and

---

[22]The record also reflects that Plaintiff's contentious responses to that supervision no doubt increased tensions. For instance, when in December 2021 Dunham asked her to confirm whether she followed certain instructions provided via link, Plaintiff replied *inter alia* "I told you that link did not work. Is Patrick's instructions below no correct? [sic] That is what I used. He called me and advised me this needed to get done. There are so many messages about the same stuff…. *This is out of control*," and "What is the problem? I used the instructions given. The link did not work and you have had the instructions Patrick gave me for a week. There are too many people giving me instructions." [Doc. No. 46-1] at 104–05 (emphasis added). When Daniels contacted Plaintiff saying "I have to caution you on this email…while you are not a direct report, it is expected that your responding will be more respectful," (*Id.* at 103.) Plaintiff replied "Stephen, I have the right to ask a question…I am sorry is if you felt was disrespectful [sic]." *Id*. at 102. The record contains numerous other email records showing similar escalations which appear to have been driven mainly by Plaintiff. *See, e.g. Id.* at 112 (On December 17, 2021, Plaintiff states to Daniels "I'm sorry you are the only one who expects something that was impossible without training…I will make note of this one as well.")

Defendant is entitled to summary judgment in its favor on those claims as a matter of law. Accordingly, it is hereby:

ORDERED that Defendant's Motion [Doc. Nos. 44, 45] be, and the same hereby is, GRANTED; and it is further

ORDERED that Count IV (insofar as it arises under the ADA) and Count VIII be and hereby are DISMISSED pursuant to Fed. R. Civ. P. 12(b)(1) for lack of federal subject matter jurisdiction; and it is further

ORDERED that summary judgment be entered in favor of Defendant on Counts I-VII, and that this action matter be DISMISSED in its entirety.

The Clerk is directed to forward copies of this order to all counsel of record, and to enter judgment in favor of Defendant pursuant to Fed. R. Civ. P. 58.

_____ /s/
Anthony J. Trenga
Senior U.S. District Judge

Alexandria, Virginia
June 3, 2026